29 C.C.P.A.(Patents)

## WINKELMANN v. CALVERT.

## CALVERT v. WINKELMANN.

### Patent Appeals Nos. 4559, 4560.

Court of Customs and Patent Appeals.
June 15, 1942.

Rehearing Denied July 10, 1942.

Zabel, Carlson, Gritzbaugh & Wells, of Chicago, Ill. (Edward C. Gritzbaugh and Foster York, both of Chicago, Ill., of counsel), for appellant.

Pennie, Davis, Marvin & Edmonds, of New York City (Clarence M. Fisher, of Washington, D. C., R. H. Waters, of Akron, Ohio, Frank E. Barrows, of New York City, Gordon C. Mack, of Akron, Ohio, and Roger T. McLean, of New York City, of counsel), for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

BLAND, Associate Judge.

This is a United States Patent Office interference proceeding relating to an invention of a rubber product and the method of making the same, the issue being comprised in twenty-five counts, of which twenty-one are method counts and four are article counts, and involves certain Winkelmann patents, from which all the counts are taken, and an application of Calvert, Serial No. 133,172, filed March 26, 1937.

Counts 1 to 19, inclusive, are taken from a patent to Winkelmann, No. 2,046,986, issued July 7, 1936, on an application filed March 18, 1935. Counts 20 to 22, inclusive, are taken from a patent to Winkelmann, No. 2,075,251, issued March 30, 1937, on an application filed May 11, 1936, and counts 23 to 25, inclusive, are taken from a patent to Winkelmann, No. 2,075,254, issued March 30, 1937, on an application filed May 20, 1935.

The decision of the Board of Appeals and the decision of the Examiner of Interferences resulted in what is termed "split decisions," i. e., priority of invention in counts 1 to 7, inclusive, and 13 to 25, inclusive, was awarded to Calvert, and priority of invention as to counts 8 to 12, inclusive, was awarded to Winkelmann. Winkelmann appealed to this court from that part of the board's decision which awarded counts 1 to 7, inclusive, and 13 to 25, inclusive, to Calvert; and Calvert appealed as to that part of the decision awarding priority of invention in counts 8 to 12, inclusive, to Winkelmann.

The invention relates to the processing (such as milling, molding and calendering) of rubber hydrochloride. Rubber hydrochloride was old before either of the parties hereto began their work relied upon here. The invention is more particularly directed to the use of certain stabilizers which prevent decomposition of the rubber hydrochloride at elevated temperatures, which thus permits the formation of products from this material by the steps of milling, calendering and molding (which steps are familiar to the rubber industry), without the defects which have heretofore been observed in the prior art attempts to use such rubber hydrochloride for such purposes. The processing is done in the presence of certain basic substances. Magnesium oxide is a good example of such a basic substance. The outstanding feature of the involved invention is that if certain basic substances are used in processing rubber hydrochloride, the product remains stable and no hydrochloric acid is thrown off. Certain minor features relating to the invention, such as the use of sulfur, which have been regarded as of importance by the tribunals below and the parties, will be referred to more particularly hereinafter.

On account of the several issues raised which require discussion here, we think the counts may be divided into three classes. The first class consists of counts 1 to 7, inclusive, and 13 to 19, inclusive, and relates, generally, to milling rubber hydrochloride with a basic substance which retards the heat disintegration or decomposition of the rubber hydrochloride. Some of the counts name specific basic substances, such as magnesium oxide, calcium oxide, hexamethylene tetramine, and the like. Of this group, count 1 is regarded by us as illustrative. It follows: "1. The method of making a homogeneous thermoplastic composition adapted for molding, calendering and the like, which comprises milling a halogen containing rubber derivative with a basic substance of such character and in such amount as to retard heat disintegration of the halogen containing rubber derivative."

The second group consists of counts 20 to 25, inclusive, and relates generally to the use of sulfur with rubber hydrochloride or other rubber hydrohalide. Count 21 is illustrative of this group and reads: "21. The method which comprises milling a rubber hydrohalide with elemental sulfur."

The third group comprises counts 8 to 12, inclusive, which have to do with calendering into thin sheets the aforesaid mixture of rubber hydrochloride and a basic substance. Count 8 is illustrative of this group and follows: "8. The method of making a thin sheet, suitable for wrapping purposes which comprises callendering into thin sheet form a mixture of a halogen containing rubber derivative and a basic substance of such character and in such amount as to retard heat disintegration of the rubber hydrochloride."

As is shown above, Calvert's application was not filed until after the issuance of the patent from which counts 1 to 19 were copied. Counts 20 to 25, inclusive, are from the two patents which issued after the filing of Calvert's application. The Examiner of Interferences stated that as to the counts copied from the first-named patent, the burden was upon Calvert to prove priority beyond a reasonable doubt and that as to the counts which originated in the latter two patents, issuing subsequently to the filing of Calvert's application, Calvert was only under the burden of proving his case by a preponderance of the evidence. The board made no distinction in this re-

spect, and in view of our conclusion it is not necessary for us to do so. The last statement is made here by reason of the contention of Winkelmann that he had disclosed, but not claimed, the subject matter of counts 20 to 25, inclusive, (the "sulfur" counts) in the patent which issued prior to Calvert's filing date.

As we view it, the case is primarily one of originality. Both parties took testimony at great length. Calvert attempted to prove that he had reduced to practice the invention by his work beginning in 1931 and continuing to 1934. He also contended that he had disclosed the subject matter of certain of the counts in an earlier-filed application, Serial No. 682,116 (filed July 25, 1933) which was copending with his instant application.

The Examiner of Interferences, at great length, carefully went into this testimony and pointed out lack of corroboration and other defects of the proof and held that the party Calvert had not proved a reduction to practice at any time prior to the filing of his application, but held that with the exception of counts 8 to 12 he had established a conception date prior to any date to which Winkelmann was entitled, and had disclosed the subject matter surreptitiously to Winkelmann's assignee, or its predecessors.

The Board of Appeals agreed with the examiner upon all of said holdings but found it unnecessary to repeat in its decision all the evidence and reasons stated by the examiner. We (like the board) think that no useful purpose would be served by a recapitulation of what the Examiner of Interferences has so clearly and fully stated in his decision. We agree that the exhibits and testimony presented by Calvert show that he had a conception of all the subject matter of all the counts in which he was awarded priority before any inventive date to which Winkelmann is entitled, and in addition we are of the opinion that he has satisfactorily shown sufficient knowledge of the controverted subject matter in counts 8 to 12, inclusive, as to enable him to have communicated the subject matter of such counts to Winkelmann or his parties in interest. This latter holding on our part will be more particularly referred to hereinafter.

The facts relating to originality are somewhat involved. They have been gone into by the Examiner of Interferences in

great detail. The board has referred to the more important ones, and we will confine ourselves to a condensed statement of the evidence on the subject of originality, and will omit many circumstances, and facts stated by the witnesses, which may have some bearing on the issue but are not of sufficient importance to require detailing here.

Calvert, the junior party, was conducting research and in charge of part of the research department of the Goodyear Tire & Rubber Company at Akron, Ohio, as a full-time employee. Calvert's application is assigned to the Wingfoot Corporation, which is an affiliate of the Goodyear Tire & Rubber Company. While working as rubber research chemist for the Goodyear Tire & Rubber Company, he, in 1931, first began working with rubber hydrochloride, which is a combination of rubber and hydrochloric acid; and during that time he had become interested in the development of a rubber hydrochloride film known as Pliofilm, which was developed and put on the market by the Goodyear company. The process was patented and involved spraying or casting the rubber hydrochloride so as to form a sheet. He continued to work in the Goodyear employ until March 1, 1935, when he became the full-time employee of the Marbon Corporation (formerly called the Marbo Products Company), the predecessor of which corporation was the Marsene Corporation. In the latter part of 1933, without the knowledge of the Goodyear company, Calvert accepted part-time employment with the Marsene Corporation. He claims that he was employed as a consultant to work on protein films. During the continuance of his part-time employment with the Marsene Corporation, Calvert was concerned with numerous experiments with rubber hydrochloride in the Goodyear laboratories. Calvert's assignee, the Wingfoot Corporation, relies upon these experiments to establish conception and reduction to practice. It also relies principally upon evidence relating to these experiments, made while Calvert was in that employment, for the knowledge which Calvert had acquired and which, it now alleges, was the subject matter conveyed to Winkelmann or his assignee.

During the period while serving as a part-time employee of the Marsene Corporation, and ostensibly as a full-time employee of Goodyear, Calvert kept in close touch with the Marsene Corporation and certain of its officers and employees. He had a number of conversations with its officers and employees and much correspondence passed between them, some of which is definitely shown to be closely related to the invention here at bar. Apparently from the evidence, Calvert originally was somewhat in doubt as to just who was his part-time employer. He appears to have been retained as a consultant by Mr. Borg or Mr. Williams, who were officials of the Marsene Corporation at the time. Winkelmann became an employee of the Marbon Corporation about the time it was formed, November 1, 1934. Mr. Borg of Borg-Warner Corporation was president of the Marsene Corporation.

The Marsene Corporation had, prior to the employment of Calvert, been interested in making a thin, transparent film from casein, and at the time of the employment of Calvert, or soon thereafter, became much interested in using rubber hydrochloride and was confronted with the problem of finding something that would prevent decomposition of the material and the throwing off of hydrochloric acid, which the composition contained, when it was subjected to heat. The Marsene Corporation was financed by Borg, who was a director and chairman of the board of the Borg-Warner Corporation. Borg owned Marsene and sold out to the Borg-Warner Corporation in the fall of 1934 when the Marbo Products Company was formed as a successor corporation. The Marbo Products Company later became the Marbon Corporation.

Borg was president and Floyd E. Williams was vice-president of the Marsene Corporation. Williams was in active charge of the company. Williams was a vice-president of the successor Marbo Products Company and Marbon Corporation. Borg visited the Marsene plant at Gary, Indiana, about once a month and received reports from time to time in Chicago.

Williams began correspondence with the Goodyear company, and he and a Dr. Gebauer, chief chemist of the Marsene Corporation, went to Akron to interview the Goodyear people. They were concerned with obtaining a waterproof film. During the negotiations which followed, Williams learned that Goodyear was working on a transparent film of rubber hydrochloride and sought to make arrangements with Goodyear to manufacture the rubber hydrochloride solution and sell it to the Mar-

sene Corporation for use in making the films. The negotiations fell through, and it was during these negotiations that Williams made the acquaintance of Calvert, who, as before stated, was a research chemist working on rubber hydrochloride. In July 1933 the Marsene Corporation dismissed three of the chemists it was then employing, which is explained by Williams as the result of a desire not to go on with an extensive program on the old lines. None of the men who were let out had been working on rubber hydrochloride. Of the old employees, Dr. Gebauer and his assistant, Dr. Moffett, were the only ones who worked on rubber hydrochloride after the date when the other employees quit.

In July 1933 Calvert made a trip to the World's Fair in Chicago. He stopped off at Gary to see Williams about getting a job with the Marsene Corporation and at that time talked with Mr. Borg and Mr. Williams and also Dr. Gebauer. It will be remembered that at that time the Marsene Corporation wanted to make transparent sheets from rubber and was interested in employing a chemist who had had experience in rubber compounds. Some time later, an agreement was entered into with Calvert for employment as a consultant, and Williams consulted Borg before employing Calvert. For about a year this employment with Marsene continued and was concealed from the Goodyear company, and extra precautions were taken to keep such employment in secrecy. As before stated, Calvert did not know definitely who his part-time employer was. He received his payment from Mr. Borg or Mr. Williams, and he stated that he did not know who officially was paying the money. Some of the checks that came to him at Akron came from Chicago. He received for his services about $1,200 on a monthly basis of $100. Payments were somewhat irregular. Williams stated that the books of the Marsene Corporation would not show the payments made to Calvert and that no record of them was kept.

Calvert admits that his contract with Goodyear obligated him to keep all matters which belonged to that company secret, which, it would seem, would have been known to Borg and Williams. Calvert admits that he told no one in the Goodyear company about his relations with the Marsene Corporation.

In the latter part of 1934, at Williams' wired request, Calvert met Williams at Cleveland. There, Williams says, Calvert asked him for a full-time job. Calvert says that his trip to Cleveland was a month or two before he decided to go with Marbon. He then decided to leave Goodyear and notified Goodyear a month before he left them. It would seem that this trip to Cleveland was around the latter part of the year—probably December 1934, which is the date of the last payment which Williams made to him. There are other circumstances which might be related as throwing light upon the relationship between Calvert and his said part-time employer and the purposes of that employment, but they need not be stated here.

During the period of the year or more of Calvert's surreptitious employment, he, according to his own admission, wrote some twenty reports or letters, mostly to Mr. Williams—one or two of them to Borg. They were written on the typewriter and for part of them carbons were made. Williams' letters to Calvert were similarly typewritten. They were dictated to a stenographer and later transcribed.

Calvert and Williams were asked to produce the correspondence. They stated that all the correspondence and reports had been lost or destroyed, and that they could not find any of them. Winkelmann admitted that the Calvert correspondence was in the files of the Marbon Corporation in April 1935, at which time he stated that he went through it. Winkelmann left the Marbon Corporation in July 1937; and when he left, the said correspondence was still there. In response to a subpoena, Mr. Keck, secretary of the Marbon Corporation, stated that the Calvert correspondence file could not be found. From this testimony it appears that the Calvert-Williams correspondence disappeared after the present interference was declared (May 13, 1937).

Calvert's assignee urges, in substance, that these facts show that Calvert and Williams, by reason of the disappearance of the correspondence, thought that they were in a position to completely hide their clandestine dealings and that their statements that Calvert's dealings with Williams had nothing to do with rubber hydrochloride could not be disproved.

Certain of the original stenographic notebooks of the stenographer who wrote Williams' letters to Calvert during the period in question had not been destroyed and were produced and proved, and the letters were transcribed. The letters dealt mainly with rubber hydrochloride and we think

show that Calvert was keeping Williams informed about everything that Goodyear was doing in connection with rubber hydrochloride. One of the earliest of said letters to Calvert stated: "* * * we are now about ready to make a transparent sheet from rubber and naturally would be interested in adding a chemist to our organization who has had experience with rubber compounds."

His letter suggested that Calvert should get in touch with Williams for a personal interview on July 15, (1933). Later in the month of July, Williams acknowledged a letter from Calvert written on the 25th of July and stating that he was taking up with Mr. Borg immediately Calvert's employment, and that he, Williams, hoped to be in Akron within the next ten days and "will bring with me a contract as per your suggestion for execution." The contract is among the lost papers. Much of interest could be detailed concerning said letters, of which the foregoing is an example.

One original letter from Calvert to Williams was not lost or destroyed. The record shows that it was taken from the waste basket by a Mr. Ernst, who began work for the Marbon Corporation in January 1935. The witness Kratz, former secretary and treasurer of the Marsene Corporation, corroborates Ernst regarding it. Calvert's signature is on the letter, and he admits writing it. A certain preparation, di-ortho-methyl cyclohexyl piperazine, was mentioned in the letter, which preparation he stated he made while employed by Goodyear. Calvert, who obviously was a biased and unfriendly witness in respect to the interests of his assignee, thought the compound did not amount to much; and the letter is referred to here merely as indicating the character of work he was doing for Winkelmann's assignee during the time he was employed by Goodyear.

Much more could be related concerning the letters and other facts pertinent to showing the nature of Calvert's services to Winkelmann's assignee while he was in the Goodyear employ, but we think the foregoing is sufficient statement of the same to disclose clearly that Calvert's employment as aforesaid was for the purpose of obtaining information relating to the gist of the present invention, and that Calvert, who had been working on this phase of the case for years, and probably knew more about the subject than any other man, imparted all the information he had of value to Winkelmann's assignee through some of the sources heretofore indicated.

It is urged by Winkelmann that the board erred in accepting the evidence of record as proving beyond a reasonable doubt that Winkelmann derived his invention from information obtained from Calvert, and his counsel quote a familiar principle of law that circumstantial evidence or a chain of circumstantial facts cannot be accepted as proving a given fact beyond a reasonable doubt, if upon any other theory the same circumstantial evidence could properly bring one to a different conclusion. It is our view, as it was that of the Examiner of Interferences and of the board, that the foregoing facts point to but one conclusion, i. e., that Calvert surreptitiously sold the knowledge he gained concerning the invention at bar to Winkelmann's assignee and that he gave to them such information as he had obtained while working for Goodyear. No other rational conclusion can be reached from these facts.

As was stated by the Examiner of Interferences, Calvert used sulfur as an ingredient in his formula V419. The examiner held that Calvert had a conception of the invention in the so-called sulfur counts, 20 to 25, inclusive; and we are in agreement with this conclusion.

Not only is it our view that Calvert imparted the information which enabled Winkelmann to reduce to practice the invention of all the counts which were awarded to Calvert, but we think that he gave to Winkelmann's assignee information concerning the calendering or rolling into sheets of the rubber hydrochloride material which led to its reduction to practice. All the circumstances and facts of record point unmistakably to the correctness of this conclusion. While Calvert was working for Goodyear, he must have had full knowledge of rubber calendering. The record shows that he calendered this material. True enough, it does not show that he calendered it thin enough to make the kind of wrapping material Winkelmann's assignee was seeking, but it must be conclusively presumed that during his surreptitious employment he imparted the calendering information which he possessed and which was sufficient to enable Winkelmann to further develop this phase of the art. In view of all the circumstances recited, it would be illogical to conclude that Winkelmann did not receive

from Calvert that which Calvert was hired to impart. In the light of the exhibits introduced by Calvert's assignee showing the calendering of rubber products into thin sheets and the purposes for which they were to be used, no doubt is left concerning Calvert's having full knowledge of the calendering characteristics of his product.

As before stated, calendering rubber products was old in the rubber milling art. Winkelmann's assignee wanted thin rubber. It sought information from Calvert. Is it supposable that Calvert did not tell all about the calendering characteristics of his new rubber hydrochloride product? We think not. Therefore, anything that is in claims 8 to 12 with reference to calendering has its foundation in the information imparted to Winkelmann's assignee by Calvert.

In the light of the foregoing, Winkelmann's testimony concerning his being the original inventor of the subject matter of the involved counts is rather remarkable to say the least.

In August 1934, Winkelmann was working for Herron and Meyer, and on a trip from Denver, Colorado, to Akron, Ohio, he was in Chicago and got in touch with George B. Dryden, president of the Dryden Rubber Company, who was a director of Borg-Warner Corporation. Mr. Meyer of the firm with whom he was employed suggested he see Mr. Dryden. At that time Borg-Warner was considering acquiring the assets of the Marsene Corporation and obviously was interested in determining the commercial value of its rubber hydrochloride developments. Winkelmann called Dryden by telephone and a meeting was arranged at the office of C. S. Davis, president of Borg-Warner, for August 28, 1934. Davis and Dryden were both present. Mr. Winkelmann testified as follows: "Mr. Davis and Mr. Dryden told me they were interested in a new product which had been called to their attention, and asked me what I knew about rubber hydrochloride. I told them, as far as I was concerned, they could throw it out the window, because any rubber hydrochloride which I had seen was not stable."

Up to this time he had not been connected with Winkelmann's assignee or its predecessors, although he had been previously employed as a consultant by Davis, president of Borg-Warner Corporation. His testimony further shows that Borg joined the meeting and told him that the Marsene Corporation had developed a new type of rubber hydrochloride, which was more stable than previous products by reason of certain stabilizers which were used but which Borg at that time did not name. The character of stabilizing work, for instance, against heat, is not shown by the record to have been referred to at that time. The record does not show that anyone told him what to use or the particular purpose for its use.

Borg was not called to testify and he, of all men, was in the best position to tell the exact background of Winkelmann when the latter undertook to make the experiments in controversy beginning on August 28, and this fact weighs heavily against Winkelmann's position in this case. On August 29, 1934, the day after the meeting with Borg and Davis, Winkelmann and Meyer obtained some samples of rubber hydrochloride and went to the Dryden Rubber Company where, it was stated, Mr. Kirschner, the Dryden chemist, told Winkelmann that he had previously attempted to handle rubber hydrochloride on the mill and had been unsuccessful because of its decomposition. Winkelmann, Meyer, and Kirschner started work at once and incorporated magnesium oxide in the rubber hydrochloride and milled and molded the same without its throwing off hydrochloric acid gas.

Kirschner corroborated Winkelmann; Meyer corroborated Winkelmann and Kirschner that the work was done on this date. The work was set down in a memorandum notebook, which is of record here. The experiments were also indicated in loose leaf pages, which were introduced in evidence.

Zinc oxide was used and shown to be disadvantageous. Winkelmann's proof is to the effect that his continued experiments in September of that year enabled him to determine for a certainty that magnesium oxide was useful in retarding decomposition of rubber hydrochloride. These facts had been determined long before by Calvert, and it seems quite improbable that this great problem could have been solved so summarily under the circumstances stated unless he had received precise information of Calvert's experiments in this line of work. On August 30, 1934, Winkelmann brought samples of his rubber hydrochloride which had been molded at the Dryden Rubber Company to Dryden at the

Chicago Athletic Club. There Winkelmann for the first time met Williams, who was in charge of the Marsene interests. Winkelmann's work continued along this line in September and part of October. In December, some pertinent activity was shown in the Marbo Products Company laboratory at Gary.

All the said acts occurred prior to any time when Winkelmann had actually come in direct contact with Calvert, whom the record shows he met for the first time in February 1935. Winkelmann states that when he first met Calvert, he did not discuss his alleged invention, and that he did not know that Calvert had previously worked for the Marsene Corporation. When Calvert went to work for the Marsene Corporation on March 1, 1935, as a full-time employee, he became acquainted with what Winkelmann was doing on the invention of the counts, which shows that the invention was being carried out by Winkelmann prior to Calvert's permanent employment. The application for the basic Winkelmann patent, No. 2,046,986, which contains counts 1 to 19, inclusive, was filed on March 18, 1935.

Calvert, who is shown to be a witness hostile to his assignee's interests, accounts for signing his instant application upon the theory that Goodyear's attorney represented to him that it was a continuation of a previous application he had filed for Goodyear. The instant application was filed March 26, 1937, after Winkelmann's patent claiming the subject matter of the main invention involved had issued.

We think that all the counts in the interference should fall or stand together, and that the record shows beyond any reasonable doubt that the invention of all the counts copied from the Winkelmann patents as aforesaid had their origin in Calvert when he was employed by Calvert's assignee, and that priority, therefore, was properly awarded to Calvert as to claims 1 to 7, inclusive, and 13 to 25, inclusive, and that it erred in failing to award priority of invention of counts 8 to 12, inclusive, to the party Calvert.

That part of the decision of the Board of Appeals, affirming that of the Examiner of Interferences, awarding priority of invention defined in counts 1 to 7, inclusive, and 13 to 25, inclusive, to Calvert, is affirmed, and that part of its decision, affirming that of the Examiner of Interferences, awarding priority of invention defined in counts 8 to 12, inclusive, to Winkelmann, is reversed.

Modified.

LENROOT, Associate Judge, concurs in the conclusion.